Case No. 18-7133, Warren Thorp, Appellant, v. District of Columbia, Ed Allen. Mr. Bradshaw for the appellant, Mr. Law for the employees. Good morning. Good morning, Your Honors. If you'll please record, my name is Horace Bradshaw. I'm here for the appellant, Mr. Mark Thorp. The reason I'm here, Your Honor, is that the intrusion, we're looking to remand a dismissal of a matter. We believe this should have been given an opportunity for a jury trial. There was an intrusion into the closed corners of Mark Thorp. They went into a kitchen freezer pursuant to an animal humane society search warrant to concern themselves with a dog that may have been abused. Pursuant to that search warrant, they ended up rummaging through a freezer. This search warrant did not happen in a vacuum. Did not happen? Did not happen in a vacuum. Something led up to it. The search was a culmination of a series of searches. Was the search of the freezer in contravention of the search warrant? It was a pretty broad search warrant, wasn't it? The search warrant came as a result of an apparent viewing. What did the search warrant say? The search warrant allowed them to look for a dog who was experiencing an abuse. That was the reason. What was the actual language of the search warrant? It was not just to look for a dog. It was to look for evidence of cruelty or abuse, right? Yeah, inside the house. Inside the house. Was the freezer inside the house? It was. So what was there about looking into the freezer that violated the search warrant? It was a very broad search warrant. It was broad, Your Honor, and we have questions about the basis for the search warrant being granted as well. Okay, let's just take one at a time. Was there something, taking the terms of the search warrant itself, was there something about looking into the freezer that violated the terms of the search warrant? The search warrant was granted to Animal Humane Society personnel, employees. They had already determined there was no abuse evident. There was a subsequent rambling through the home as a result of this. It was outside of... That's a different question, isn't it? I mean, the question I'm getting at, was there something about the search of the freezer that contravened what the language of the search warrant itself allowed for? I would argue that there was. And what was that? They were looking for very specific evidence of abuse. There was no evidence of abuse. There would be no scope in the freezer to identify abuse of the animal. There would be nothing in the freezer that would identify an abuse of an animal. That was not... Your argument is because they saw the dog, they saw the water, they saw the dog food, and they concluded the dog was okay. And so if you open the freezer to look for food, you know there's already food. So there's no point. Is that your argument? That's some part of it, Your Honor. Well, I mean, my purpose point is there is some language in the search warrant that's broad. And I think your argument is that the search warrant was not... has to be read in the context of what the people who applied for it identified was the purpose of seeking this authority. Yes, I would agree with that. That's not a concession on our part. We're simply saying that this was not a search warrant that was granted or ended up in the freezer by mistake. There was more to this. It was not a vacuum. The officers, the Washington Humane Society employees... Do you mind if I go to the question of whether they were officers or not, or should I simply stick with what we have? Let's stick with what we have. Okay. The Humane Society employees did in fact perform their duties as civilian arbiters of our Washington Humane Society rules and regulations. Once they determined that there was no evidence of abuse, there would be no reason to go into the freezer. And the reason given by the government for entering the freezer was a notion, an instinct, as in each case, that they felt or they suspected there might be something in the freezer. So we're not hearing... this isn't a suppression hearing that we're reviewing, right? Right. We're looking at this under qualified immunities. They're qualified immunity for the officer here. And to show... to pierce that, you have to show that he violated some clearly established law. What was the clearly established law he violated by looking at the freezer? Qualified immunity is one part of this. But what we're really looking for is a chance for a jury to have a chance to review these facts. Well, I'm looking at qualified immunity right now. So what... can you help me understand that? What was the clearly established law that was violated when you looked into the freezer? I believe that when he expanded the scope of the search to include the freezer. When you say expanded, what do you mean? I mean, in response to Judge Griffith's questions, you haven't identified any way in which the search exceeded the language of the search warrant. I'm thinking because I am looking to respond to the question, and I know what I understand about the case. I believe it is my position, or our position, that once the professionals, the humane society professionals, have reviewed the conditions... I'm looking for the proposition that an opinion right off the bat by a professional bars the exercise of judgment by the officer executing the warrant, which would be extraordinary. Because SH does say that the generic statements of a narrative that's used to support a search of this type, they have to be somewhat more specific and somewhat less than clairvoyant. They have to know more about the circumstance, more about what they asked for, more about what they're looking for. I can't simply say we can do this because we are the police. The district court cited for you the proposition that under qualified immunity, you would have a very high burden to show that the decision to go into the freezer was basically incompetence. Well, I mean... A difficult, no, and that may well be true, and I agree with that. No, it's not a question it may well be true. That was what the district court said. You have to show us that the district court was in error in that, and I thought that's what Judge Griffith's questions were giving you the opportunity to do. And I'm trying my best to give it. What I'm saying to you is as follows. I believe they've gone, that this sort of question, the questions that you're raising to me weren't an opportunity for a jury to review the facts. No. What allowed, I understand what you're saying, Judge Rogers, I do. And... No, I'm just saying what the Supreme Court has said you have to show to overcome qualified immunity, and you have to make that argument to us. And I think your brief makes clear sort of what your theory is, but the district court rejected it and told you why. And we have to be persuaded the district court was wrong. Your Honor, I apologize, but I have to yield to the brief and responses to that question. I cannot respond more than to say that there is a case that suggests that an officer must have something more than clear voice, must have something more than a routine narrative that allows him to search the entire property as a result, particularly in this matter. And I apologize, I know I'm running out of time, but I'm doing my best to respond. Steve, did Judge Williams? No. All right. Do you want to move on? Thank you. With the start of the First War and obtained by the civilian employee of the Washington... Your Honor, does it... Now my time is... We're giving you a few extra minutes. Thank you. The Washington Humane Society, the District of Columbia repeatedly calls for the humane law enforcement officers, but does not take responsibility for their official actions. Law enforcement authority can only exist by delegation of the mayor. It does not exist otherwise. This delegation is permitted by the mayor appointing special officers. There's no indication that the Humane Society has been identified as a special officer, but if they were and have been, then the government would have to take responsibility for their training, for their preparation for this work, and that has not been done. That is a concern. But the Metropolitan Police officers, and this goes somewhat to Judge Griffith's concern, where it seems that the employees of the Humane Society did not necessarily understand what the nature of the search would be, or the scope of the search would be, or how it happened that they would ransack the home looking for evidence of abuse of an animal. I do believe that the officers, particularly Ramsey, did know. They simply searched and whatever he could later contrive a narrative to justify, and that's where I was moving the court. I hope that that would be your concern, but I understand the other concern that you presented, sir, and I wish I was more alert to it. But I must say, it is a concern that is somewhat absurd that the officer would search and then justify. Search the freezer and then respond. And the narrative that he used is the same narrative that's been objected to in the past. So that is a concern. He ended up in the kitchen, then outside, there's just so much going on. The reason, I must say this, there are just three facts that the government can't overlook. And we haven't addressed this, but you've read the brief. On the morning of the raid, there was an advertisement for an AMC commissioner's property to be sold. The gentleman who was about to be the beneficiary of that auction was the appellate, Mr. Thorpe. Officers were outside his home. They wrote tickets on his property, on his private property, on cars on his private property. They wrote tickets for bus zone violations when there was no bus zone. They suggested that they saw him hit a dog. Depositions later, it was suggested they may have seen him hit a dog. That was the basis for this initial warrant. Now, on that morning, officers Rapp and Enola wrote tickets, as I indicated. The home was raided, and the results of the raid were reported back to the chief of police. Now, there is evidence offered that they were also reported back to the AMC commissioner involved. That is also in the record. This was not an issue. This was not an issue that was right for summary judgment. That's the concern here, and that's why I'm here. I would note one other final matter. There was money taken on that time. Eventually, after a year and a half, it was returned. However, there was $30,000 in cashier's checks in the police record, photographs of it. It never apparently made it to the evidence booth. It's never been returned. That is a question that someone might want a fact finder to review. Where is that money? How did that play into this? Those are legitimate concerns. Those are legitimate reasons to bring an action. Summary judgment just is not appropriate under these circumstances. All right, why don't we hear from the government, and we'll give you a couple of minutes in rebuttal. Good morning. Good morning, and may it please the court, Richard Love for the District of Columbia and Lieutenant, now Captain, Kyle. The district court correctly found that both the search warrants were appropriately authorized, that Lieutenant Kyle did not exceed the scope of the initial warrant, and that there was probable cause for Mr. Thorpe's arrest. Mr. Thorpe failed to allege a favorable termination of his criminal prosecution sufficient to state a claim, a plausible claim for malicious prosecution. He failed to properly amend his complaint to include any allegation related to the seizure of his currency, and the court properly denied his untimely attempt to add unrelated claims against new defendants. He also failed to present any developed argument that the court erred in dismissing his conspiracy claim, and he failed to submit evidence to demonstrate that Lieutenant Kyle was an active participant in a prior Fourth Amendment violation sufficient to hold the district liable for negligent supervision and retention. And finally, the district court did not improperly ignore the deposition testimony referenced by Mr. Thorpe during the summary judgment briefing. The basis for this... What about the freezer? We've talked about the freezer. So, Sergeant Kyle, as the court noted, first of all, the warrant is very broad. It says, animals physically abused, dead or alive, born or unborn... Mr. Love, I agree with you on that. Was there anything that could have happened in the search that would have made it impermissible to look into the freezer? No. And I think it's important... No? Why is that not the case? I mean, here the Humane Society officers say, we've got enough. We see the dog. Dog looks fine. We're going to take the dog into the vet just to double check. There's enough food here. There's enough water there. The experts say, we're done. And yet, Officer Kyle goes to look in the freezer. Right. Why? Well, as he testified, he was looking for animals dead or alive, and a good place to store a dead animal is in a freezer. And again, there were hours between... What kind of animal were we talking about? Well, it could have been a cat. It could have been... No evidence this man had a cat. Well, but the idea that... This man had a large dog, right? I understand that. But the idea that this warrant is confined solely to that. The warrant plainly says any other evidence of animal cruelty. The fact that he was observed inflicting a punishment that caused his dog to yelp and cry in pain, multiple strikes, means he could have abused other animals. There could be other evidence of abuse of other animals, including cats, should they be in the house. They didn't know one way or the other. He had hours to secrete any evidence of other animal cruelty because the police repeatedly asked him to come outside... I don't know. If a man is seen striking a dog... Yes. And that testimony is not the strongest that is suggested from time to time. And you get a warrant because of concern about cruelty to that dog. Well, that was the precipitating event. I know, but... How far can you go? Well, I don't think... As long as the guy's not watering his plants, you know? That's the only concern here. And you're looking at, I gather, in the freezer that's part of a refrigerator, as distinct from a separate freezer that would be large enough to hold a dog. Dogs come in wide sizes. But my point is, they have a suspicion that this man may be mistreating his dog. That's it. There's no evidence that he has a reputation as an animal abuser, that people in the community have been concerned about how he's treating cats and other animals. I'm just wondering that after, as Judge Griffith's hypothetical suggests, after the experts said, we're satisfied, there's no evidence of animal cruelty here. Let's go. Well, the experts, as Officer Russell and her supervisor, Officer Durama, both testified that there have been occasions where they have searched freezers for evidence of animal cruelty. So it's not beyond the tail. Ah, yes, but that doesn't mean that those searches were legal. All right? And we don't know what kind of animals they were looking for. They don't know if they found anything. You know, I mean, a lot of things happen in life. So I just wonder how far the district wants to go on this type of search warrant. Well, I think we'll go so far as I think the district court correctly indicated. I've indicated what Lieutenant Kyle testified to. What should have happened here then is that the magistrate issued too broad a warrant, that it should have been made clear, based on the affidavit, that the warrant was to look for cruelty to this animal as there was no evidence, no indication, no suggestion that this man was abusing animals or even had an animal other than this dog. Well, I think the district court properly addressed that possibility. He indicated even if the scope of the warrant was a mismatch for the allegations, that Lieutenant Kyle would still be entitled to qualified immunity. So that's where we are on this, and that's the end of it. And as we've been talking with counsel for appellant, the Supreme Court has made it very clear that the burden is very heavy to defeat qualified immunity. Right, and I would suggest that, or I would submit that we have a number of things that show we didn't act in violation of clearly established law or otherwise incompetently. We have the plain terms of the warrant, which is... Well, he wasn't substantially incompetent. Excuse me? He wasn't substantially incompetent. If I said that, I misspoke. No, that was what the district court was saying. Well, I think the district court says he wasn't plainly incompetent. That's a different adverb. At any rate, I think, you know, you have both the broadness of the terms of the warrant itself, his own testimony providing a reason for why he looked in the freezer. Mr. Blunt, here's what struggles me. I agree with you that there's a broad language of the warrant and going in the freezer's fair game based on the language of the warrant. But once the experts say we've got enough, we're done, what I'm troubled with is Officer Kyle then participating in what looks like a wide-ranging exploratory search that's the very type of search the Fourth Amendment is intended to proclaim. The facts on the ground change. Of a home. Right. And what I'm trying to get at is the district telling us that under circumstances like that, once you have broad language of a search warrant, once you get in there and circumstances change and all the evidence is obtained by looking in the first spot you go to, but yet the district now, the officers now have license to look throughout the rest of the house, every nook and cranny, even though they've got everything that they need in the first instance? Is that the argument you're making? Well, certainly I understand the court's concern. But I think here, hours have passed since Mr. Thorpe was on notice that the police were going to follow up. He refused their request to explain or talk to him. I don't think you're answering my question. I want to know. I'm trying to. The district's view about what circumstances would change the nature of the search from the original search warrant? Would limit it in some way? When would that happen? The first one is there was a long opportunity for him to secrete evidence of animal cruelty because of the time that passed. I'm looking for you to tell me the limitations. Give me some hypothetical circumstances in which the officers would have an obligation to stop searching. You're giving me reasons for why under these circumstances they could go the full length of the warrant. Okay. I'm trying to get some sense of the district's sense of when does an officer say enough is enough and we don't have to look through every nook and cranny of the house, even though the plain language of the search warrant would allow that. Are there any circumstances in which the facts on the ground change the nature of the search, permissible nature of the search? Yeah. I mean, certainly. And I think it would depend on the factual circumstances, and that's why I'm having trouble answering your question since it's asking for limitations. And my understanding of this record supports, I think, what the officers did here. The last thing they looked in was the freezer. They were exercising caution to ensure that there wasn't other evidence of animal cruelty. I mean, many of the cases arise in the context of the police have evidence of unlawful criminal activity by a defendant or potential defendant. And they go in the home looking for a gun, or they go in the home looking for drugs. And, you know, the search extends. They find some drugs, but they think there may be drugs elsewhere in the house. They find one gun, but this person's given his past experience and record. There may be other guns in the house. People have talked about the man has multiple guns, that type of thing. This is a little different, isn't it? This is a man. The police tell him to take the dog inside the house. All right. He's out on the street with his dog. The dog, I gather, was in a car or SUV. And then he's on the sidewalk, and one of the officers sees him hitting the dog. And the dog yelps. So they tell him to take the dog inside the house. And that's all they have about this man to support the affidavit. Well, if I could respond to that, Your Honor, because I think the evidence is quite stronger as to what the officer's observations were. Officer Onoja repeatedly testified that he observed Thorpe strike the dog and heard it crying. You could look at supplemental appendix pages 22 to 2325. I know. There's no evidence that anybody testified he threw the dog from the truck, for example. Well, I think there was testimony that he was. I couldn't find anything about throwing the dog from the truck. No. All I found was one officer said he saw Mr. Thorpe hit the dog, and the dog yelped. All right. I think that with respect, Judge Rogers, Officer Onoja said, I saw him striking the dog who was crying at multiple strikes. So he's hit the dog several times. The dog is crying out in pain. Officer Russell. There's no statement about pain. That's what I'm trying to get at. The dog yelps. Any time a dog is hit, they're going to yelp, I suppose. But all I'm getting at is this case is a little different. The man is on the public street, and he's told to take the dog in his house. And then they get the warrant based on the Humane Society people's concern about there could be potential for cruelty to animals. And further risk of abuse for the animals, yes. And so they go in to find out if there is any such evidence, and they find none. Why isn't the search over? Well, I think the search is not over because it was reasonable for them to believe that there may be other evidence of animal cruelty beyond the dog. Even though, as is hypothetical, the experts say we're satisfied. There is no evidence of animal cruelty. Well, I mean, I think what they testified to was Officer Russell was asked about the freezer, and she said it wasn't a priority of hers to search the freezer. Well, she also testified it's possible they had been played, quote, her words. Well, that was Duramo, but yes, Your Honor, that's correct. But I think that, you know, I understand the court's concern, but I think, you know, at worst, the court correctly found that Lieutenant Kyle was entitled to qualified immunity, that his search of the freezer fell within the scope of the warrant, and that he did not violate clearly established law in searching the freezer. And we're not reviewing a motion to suppress. We are not reviewing a motion to distress. We're trying to determine whether or not the district court was incorrect in granting summary judgment. I think its decision was very thorough. It addressed numerous alternative theories, was very generous in its analysis of the complaint, and very thorough in its discussion of the record, which I think is not accurately represented in the appellant's brief. And for all those reasons, and I think that we've laid out in our brief, we would ask that the court affirm the district court's decision here. And unless the court has any other questions, I will leave it at that. All right. Counsel Phil Keller, you have two minutes. Thank you. I'd like to take this time to refer us to a deposition testimony that was referred to by Judge Rogers. I believe it hit it on the head. This is Officer Anoja. This is at page 6 and 7 of page 57 of the deposition. Officer Anoja was asked, which side were you looking? Are you looking out your window or out the wraps window when you look at the truck? I'm looking out wraps window. Okay. And it was park facing northbound. I open the door, and I'm running towards Mr. Thorpe and the dog. How come? Because I observed that the dog was maybe struck. I observed that the dog was maybe struck. Okay. Well, you observed a hand movement. You said then you thought the dog was being struck. And there was an objection. And we move forward. Okay. And did he have the dog on his shoulder? He had the dog on his shoulder. I saw the dog's back, but it's a black dog. Maybe a little brown on maybe his neck. Okay. And I saw earth. Okay. Dust on the back, on his back. Okay. And I asked Mr. Thorpe, what are you doing? And he said, I'm taking the dog in the house safely without a leash. Okay. And I said, well, take the dog in the house, and you come back out. What did you want to talk to him about? What I had just witnessed. And I move forward. Oh, excuse me. Mr. Thorpe was telling me that he was taking the dog in safely without a leash. Anything else? He puts the dog in the house. You told him to put the dog in the house, right? Yes. And he said what you told him. I don't think it's helpful to read what's simply confirming. It is. Okay, I apologize, Your Honor. What I'm saying is as follows. There was more to this than was outside the scope of that search for an injured dog. Well outside the scope of that search for an injured dog. In fact, how do you get a warrant for a dog you have told him to put in the house, and that he did put in the house safely without a leash? How does a warrant then go from putting him in the house without a leash to banging down the door, going through the home, going into a freezer? Your Honor, I think that's going a bit far. I know it's a high burden, but I believe that is too far. There's more to this than meets the eye. For this reason, and the reason set forth in the brief, the appellate's brief, and for which other reasons the court may find to be good and sufficient call, this appeal should be remanded. Thorpe's lawsuit reinstated, and the matter is set for a jury trial. Thank you. We'll take the case under review.
judges: Rogers, Griffith, Williams